**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| José A. Ramos-Ramos, et al,<br><br>Plaintiffs,<br><br>v.<br><br>Jorge Haddock; Sindicato de Trabajadores de la Universidad de Puerto Rico, et al,<br><br>Defendants. | **Civil No. 20-01232(GMM)** |

## OPINION AND ORDER

Before the Court is Plaintiffs' *Motion for Summary Judgment* and *Statement of Uncontested Facts* ("*Motion for Summary Judgment*") regarding claims arising from the deduction of union dues from their paychecks in the aftermath of the Supreme Court's decision in Janus v. AFSCME, Council 31, 138 S. Ct. 2448 (2018). (Docket No. 137). For the reasons set forth below, Plaintiffs' *Motion for Summary Judgment* is **DENIED**.

### I. PROCEDURAL BACKGROUND

On December 28, 2020, José A. Ramos Ramos ("Ramos"), Orlando Méndez López("Méndez"), Igneris A. Pérez Rosario ("Pérez"), and José Cotto Meléndez ("Cotto"), (collectively "Plaintiffs") filed their *Verified Amended Class Action Complaint* ("Amended Complaint") against Mayra Olavarría Cruz ("Olavarría"), in her official capacity as President of the University of Puerto Rico

**Civil No. 20-01232(GMM)**
**Page -2-**

("UPR") ("President of the UPR"),[1] and the Sindicato de Trabajadores de la Universidad de Puerto Rico, a public-sector labor union (the "Union"), seeking declaratory, injunctive, and monetary relief in addition to costs and attorneys' fees for alleged violations of the First and Fourteenth Amendments of the United States Constitution, pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("Section 1983"). Plaintiffs also request that the Court exercise supplemental jurisdiction over the alleged violations to Puerto Rico law, pursuant to 3 P.R. Laws Ann. § 702(a) and breach of contract. (Docket No. 26).

Plaintiffs allege that the Union and the UPR enforced a collective bargaining agreement ("CBA") that requires bargaining unit members to become and remain members of the Union and surrender full union dues. They allege that, as employees of the UPR, they were unwillingly forced to join the Union and surrender union fees deductions from their wages, even after they informed the Union that they wished to end their membership. Plaintiffs aver that, notwithstanding their protestations, the Union continues to deduct union dues from their wages and claim that this is unconstitutional, because it compels employees to become and remain members of the Union and pay dues without their consent,

---

[1] Both, the original complaint and the Amended Complaint named former Defendant Jorge Haddock ("Haddock") as the President of the UPR (Docket Nos. 1 and 26). However, his tenure ended on July 31, 2021, and on August 2, 2021, Olavarría was appointed President. *See*, Docket No. 84. On August 5, 2021, Haddock was substituted by Olavarría as a defendant of caption.

in violation of the recent Supreme Court decision in Janus v. AFSCME Council 31, 138 S. Ct. 2448 (2018). Therefore, Plaintiffs request: (1) that the provisions in the CBA between the Union and the UPR regarding dues and membership be declared unconstitutional and their enforcement be enjoined; and (2) that damages including back payment of fair share fees Defendants received prior and after the Janus decision, which were assessed and collected pursuant to the CBA, be dispersed.

On September 30, 2022, the Court issued a Memorandum and Order denying Plaintiffs' *Motion for Class Certification* (Docket No. 94) and denying without prejudice their *Motion for Summary Judgment* (Docket Nos. 95and 135). On October 28, 2022, Plaintiffs again filed a *Motion for Summary Judgment* (Docket No. 137), *Memorandum in Support of Motion for Summary Judgment* (Docket No. 137-1) and a *Statement of Uncontested Material Facts* (Docket No. 137-2). Plaintiffs assert that the Court should grant summary judgment because: (1) it is unconstitutional to compel membership in a labor organization as it deprives Plaintiffs of their First Amendment rights of free speech and association; (2) dues deductions from Plaintiffs' wages without an affirmative authorization and knowing waiver of their constitutional rights to free speech and association violate the First Amendment and constitute state infringement of the Fourteenth Amendment to the United States Constitution and Section 1983; (3) the policies of compulsory union

Civil No. 20-01232(GMM)
Page -4-

membership and union dues deductions violate Plaintiffs' First
Amendment rights to free speech and association; and (4) the Union
and UPR violated Puerto Rico law by deducting and collecting union
dues from Plaintiffs without first securing their written consent,
as required by 3 P.R. Laws Ann. § 702(a). (Docket No. 137-1).

On November 28, 2022, the Union filed its *Opposition to Motion
for Summary Judgment and Memorandum of Law in Support Thereof and
Request of Dismissal* ("Union's Opposition to Summary Judgment")
(Docket No. 141), together with its *Responses and Objections to
Plaintiffs' Proposed Statement of Uncontested Facts in Support of
its Motion for Summary Judgment* ("Union's *Opposition to
Plaintiffs' Uncontested Facts*). (Docket No. 141-1). The Union
argues that the Court should dismiss the lawsuit, except on the
dues amount owed to Plaintiffs upon their request to withdraw from
the labor organization. They contend that since they wish to
respect Plaintiffs' desire to withdraw and reimburse the dues they
paid during the relevant period, they lack standing with respect
to their demand for declaratory and injunctive relief. The Union
also argues that as to the demand for repayment of fair share fees
attributable to the period before the Janus decision—when such
fees were authorized and deemed constitutional under controlling
law— Plaintiffs fail to state a claim for relief. This, considering
the applicability of the good-faith defense to claims for damages
against private parties sued under Section 1983.

Civil No. 20-01232(GMM)
Page -5-

Plaintiffs subsequently replied to the Union. (Docket No. 144). On December 8, 2022, Haddock and Olavarría requested to join the Union's Opposition to Summary Judgment and the Court noted the requests. (Docket Nos. 146 and 149).

## II.   SUMMARY JUDGMENT STANDARD

A.   <u>Fed. R. Civ. P. 56</u>

Fed. R. Civ. P. 56 governs motions for summary judgment. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is a genuine dispute in a material fact "if the evidence 'is such that a reasonable jury could resolve the point in favor of the non-moving party.'" <u>Taite v. Bridgewater State University, Board of Trustees</u>, 999 F.3d 86, 93 (1st Cir. 2021) (*quoting* <u>Ellis v. Fidelity Management Trust Company</u>, 883 F.3d 1, 7 (1st Cir. 2018)). In turn, a fact is material "if it 'has the potential of affecting the outcome of the case.'" <u>Id.</u> (*quoting* <u>Pérez-Cordero v. Wal-Mart P.R., Inc.</u>, 656 F.3d 19, 25 (1st Cir. 2011)).  In making its determination, the Court will look to "the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits. . ." <u>Johnson v. University of Puerto Rico</u>, 714 F.3d 48, 52 (1st Cir. 2013) (*citing* <u>Thompson v. Coca-Cola Co.</u>, 522 F.3d 168, 175 (1st Cir. 2008)).

Civil No. 20-01232(GMM)
Page -6-

As a general matter, "an affidavit is equivalent to other forms of evidence, such as deposition testimony." Ayala v. Kia Motor Corporation, Civil No. 19-1150, 2022 WL 4719145 at *3 (D.P.R. 2022) (citing 10A Wright & Miller, Federal Practice & Procedure § 2727 (3d ed. 2011)). An affidavit, even one that is self-serving, may be used to support opposition to a motion for summary judgment. Malavé-Torres v. Cusido, 919 F.Supp.2d 198, 204 (D.P.R. 2013).

The movant has "the initial burden of 'demonstrat[ing] the absence of a genuine issue of material fact' with definite and competent evidence." Arroyo-Ruiz v. Triple-S Management Group, 258 F.Supp.3d 240, 245 (D.P.R. 2017) (quoting Campos v. Van Ness, 711 F.3d 243, 247-48 (1st Cir. 2013)). "Once the moving party has properly supported [its] motion for summary judgment, the burden shifts to the nonmoving party, with respect to each issue on which [it] has the burden of proof, to demonstrate that a trier of fact reasonably could find in [its] favor." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997)). Indeed, the non-movant is required to "present definite, competent evidence to rebut the motion." Martínez-Rodríguez v. Guevara, 597 F.3d 414, 419 (1st Cir. 2010) (quoting Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)).

Further, the Court must "draw [] all reasonable inferences in favor of the non-moving party while ignoring conclusory

Civil No. 20-01232(GMM)
Page -7-

allegations, improbable inferences, and unsupported speculation." Smith v. Jenkins, 732 F.3d 51, 76 (1st Cir. 2013). The Court must also refrain from engaging in assessing the credibility or weight of the evidence presented. *See* Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 135 (2000) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."). Facts which are properly supported "shall be deemed admitted unless properly controverted" and the Court is free to ignore such facts that are not properly supported. Rodríguez-Severino v. UTC Aerospace Sys., No. 20-1901, 2022 WL 15234457, at *5 (1st Cir. Oct. 27, 2022).

B.    Local Civ. R. 56

Local Civ. R. 56 also controls motions for summary judgment. *See* Local Civ. R. 56. In sum, it requires from the non-movant to "admit, deny or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of material facts." Local Civ. R. 56(c). If the fact is not admitted, "the opposing statement shall support each denial or qualification by a record citation. . ." Id. In its opposing statement, the non-movant can include additional facts supported by record citations. *See* Id. In turn, the movant "shall submit with its reply a separate, short, and concise statement of material facts, which shall be limited to any additional fact

submitted by the opposing party." Local Civ. R. 56(d). In its statement, the movant shall admit, deny, or qualify those additional facts. *See* Id. Any denial and qualification that the movant raises must be supported by a record citation. *See* Id.

Failure to comply with Local Rule 56(c) allows the Court to accept a party's proposed facts as stated. *See* López-Hernández v. Terumo Puerto Rico LLC, 64 F.4th 22, 26 (1st Cir. 2023); *see also* Natal Pérez v. Oriental Bank & Trust, 291 F.Supp.3d 215, 219 (D.P.R. 2018) ("If a party improperly controverts the facts, Local Rule 56 allows the Court to treat the opposing party's facts as uncontroverted."). Litigants ignore Local Rule 56(c) at their peril. *See* López-Hernández, 64 F.4th at 26.

### III. FINDINGS OF FACT

The Court examined Plaintiffs' *Statement of Uncontested Facts* (Docket No. 137-2) and the Union's *Opposition to Plaintiffs' Uncontested Facts.* (Docket No. 141-1). The Court only credits material facts properly supported by a record citation.

Accordingly, the Court makes the following findings of fact:

1. The Union is a bona fide public sector labor organization within the meaning of Law No. 134 of 1960, 3 P.R. Laws Ann. § 702(a). (Docket No. 137-4 at 1).

2. Since the 1950's, the Union has been recognized as the exclusive bargaining representative of the employees of the appropriate unit in the UPR as defined in its collective bargaining agreement. The

Union is also recognized as the exclusive representative of the employees by Act 1 of January 20, 1966, as amended, also known as University of Puerto Rico Act. (Docket No. 144-1 ¶ 109).

3.  Olavarría is the former President of the UPR, a public university system with multiple campuses. (Docket Nos. 137-2 ¶ 2 and 141-1 ¶ 2).

4.  The UPR collects union dues from member's wages and delivers them to the Union in accordance with the CBA. (Docket No. 141-3).

5.  At the time the Answer to the Complaint was filed, May 15, 2021, Plaintiffs Ramos, Méndez, Cotto, and Pérez were part of the bargaining unit represented by the Union. They are currently not part of the bargaining unit, since they later revoked their Union memberships. (Docket Nos. 137-21; 137-24; 137-26; 137-35).

6.  UPR is a public sector employer required to honor its contractual commitments with labor unions/organizations. (Docket Nos. 137-2 ¶ 5 and 141-1 ¶ 5).

7.  The Union recognizes the U.S. Supreme Court ruling in Janus v. AFSCME, Council 31, 138 S.Ct. 2448 (2018). (Docket No. 141-1 ¶ 6).

8.  Considering the Janus ruling, the Union recognizes that unionized public employees have the right to choose whether or not to be part of the labor organization. (Docket No. 141-1 ¶ 7)

9.  On December 23, 2014, UPR and the Union, agreed on a CBA governing UPR unit members' terms and conditions of employment, effective until "a new collective bargaining agreement is negotiated and signed, which shall not be before June 30, 2017." (Docket No. 141-1 ¶ 9).

10. The CBA, effective from December 23, 2014 through June 30, 2017, remains in effect as of today. (Docket Nos. 137-2 ¶ 10 and 141-1 ¶ 10).

11.   Article 1(D) of the CBA states: "Employees who prior to the execution of these Rules chose to be members of the Union shall continue to be enrolled members of the Workers' Union of the University of Puerto Rico within the appropriate bargaining unit." (Docket Nos. 137-2 ¶ 11 and 141-1 ¶ 11).

12.   Article 1(E) of the CBA states: "Any employee who forms part of the appropriate bargaining unit from the signature of these agreements on shall be a member of the appropriate bargaining unit and shall be subject to the deduction of dues in favor of the Workers' Union of the University of Puerto Rico, once thirty-one (31) calendar days have passed since the date when the employee began working. Once the deduction of dues is made, the employee shall continue to be a member of the Worker's Union of the University of Puerto Rico." (Docket Nos. 137-2 ¶ 12 and 141-1 ¶ 12).

13.   Article 1(G) of the CBA states: "The University of Puerto Rico retains the right to apply the provisions of these Rules to employees who are not part of the Workers' Union." (Docket Nos. 137-2 ¶ 13 and 141-1 ¶ 13).

14.   Article 55(A) of the CBA, in its first paragraph, states: "The University Administration shall begin to make deductions from new members during the payroll cycle immediately following receipt of the pertinent authorization, except in the event of extraordinary circumstances, in which case the deduction will be included in the following payroll cycle." (Docket Nos. 137-2 ¶ 14 and 141-1 ¶ 14).

15.   Article 55(B) of the CBA states: "The University Administration shall send a check for the dues deducted during the immediately-preceding payment period to the Union's Treasurer no later than ten (10) days of the payment, to the address submitted by the Union to the Administration . . ." (Docket Nos. 137-2 ¶ 15 and 141-1 ¶ 15).

16.   Bargaining unit members "have to pay dues to the Union and said payment is required by the

collective bargaining agreement." (Docket Nos. 137-2 ¶ 16 and 141-1 ¶ 16).

17. Plaintiffs Ramos, Méndez, Cotto, and Pérez were subject to the exclusive representation of the Union and subject to the CBA between the Union and UPR, until their resignation and withdrawal from membership. (Docket No. 141-3).

18. The Union does not possess any memoranda, orders, communications, or other documents (including electronic) regarding the policy of practice of mandatory union membership. (Docket Nos. 137-2 ¶ 22 and 141-1 ¶ 22).

19. The Union fees were deducted pursuant to Article 1 and 25 of the CBA which permits the UPR to withhold the dues from members' salaries and send it to the Union. (Docket Nos. 137-4 and 137-19 ¶ 1).

20. The amount of monthly union dues deducted from employees' wages is determined by the Union's Governing Board. The amount of such union dues can be increased if most of the Union's Governing Board members so decide. (Docket Nos. 137-2 ¶ 23 and 141-1 ¶ 23).

21. Ramos first started his employment with UPR as a maintenance worker at its Cayey Campus on March 1, 1996. (Docket Nos. 137-2 ¶ 24 and 141-1 ¶ 24).

22. Ramos has continuously worked at UPR's Cayey Campus since 1996 as a maintenance worker. (Docket Nos. 137-2 ¶ 25 and 141-1 ¶ 25).

23. The withholding provision in the CBA has been in effect for approximately the last 12-13 years. Before that, all employees would sign a document authorizing the UPR to withhold union dues from their salaries. If an employee did not sign the form, there was no withholding of union dues from their salary and they were not a member of the Union. (Docket No. 141-2 ¶ 5).

24. In the current CBA, there is a provision in which the parties agreed that UPR would withhold union

dues from the salaries of employees represented by the Union in accordance to Section 5(d) of Act 17 of 1931, 29 L.P.R.A. sec. 175. This collective bargaining agreement was ratified by the employees of the appropriate unit unanimously in November 14, 2014. (Docket No. 141-2 ¶ 4-5).

25. On July 3, 2018, Ramos submitted a letter to UPR, addressed to the Union's President, David Muñoz Hernandez ("Union's President"), demanding a stop to dues deductions from his wages. (Docket Nos. 137-2 ¶ 33 and 141-1 ¶ 33).

26. On March 20, 2020, Ramos submitted another letter addressed to the Union's President reaffirming his demand for an end to dues deductions from his wages and withdrawing his membership from the Union. (Docket Nos. 137-2 ¶ 34 and 141-1 ¶ 34).

27. Union dues continued being deducted from Ramos's wages through his paycheck dated May 28, 2021. (Docket Nos. 137-2 ¶ 35 and 141-1 ¶ 35).

28. For approximately ten years, Ramos served as a delegate for the Union. (Docket Nos. 137-2 ¶ 36 and 141-1 ¶ 36).

29. UPR deducted, and the Union collected, $10.00 per semi-monthly paycheck of union dues from Ramos's wages. (Docket Nos. 137-2 ¶ 38 and 141-1 ¶ 38).

30. From the time Ramos attempted to cancel union dues deductions on July 3, 2018, until May 28, 2021, UPR deducted $700 from Ramos's wages ($20 per month or $10 semi-monthly) for payments of union dues remitted to the Union. (Docket Nos. 137-2 ¶ 39 and 141-1 ¶ 39).

31. Méndez first started his employment with UPR's Cayey Campus in September 1997. (Docket Nos. 137-2 ¶ 40 and 141-1 ¶ 40).

32. Since he started working for UPR, Méndez's job assignment has been that of maintenance worker. (Docket Nos. 137-2 ¶ 41 and 141-1 ¶ 41).

33. On July 3, 2018, Méndez submitted a letter to UPR, addressed to the Union's President demanding a stop to dues deductions from his wages. (Docket Nos. 137-2 ¶ 49 and 141-1 ¶ 49).

34. On March 20, 2020, Méndez submitted another letter addressed to the Union's President reaffirming his demand for an end to dues deductions from his wages and withdrawing from membership in the Union. (Docket Nos. 137-2 ¶ 50 and 141-1 ¶ 50).

35. Union dues continued being deducted from Méndez's wages through his paycheck dated May 28, 2021. (Docket Nos. 137-2 ¶ 51 and 141-1 ¶ 51).

36. UPR deducted, and the Union collected, $10.00 per semi-monthly paycheck in union dues from Méndez's wages. (Docket Nos. 137-2 ¶ 52 and 141-1 ¶ 52).

37. From the time Méndez attempted to cancel union dues deductions on July 3, 2018, until May 28, 2021, UPR deducted $700 from Méndez's wages ($20 per month or $10 semi-monthly) for payments of union dues remitted to the Union. (Docket Nos. 137-2 ¶ 53 and 141-1 ¶ 53).

38. Cotto started his employment with UPR's Cayey Campus on August 1, 1998. (Docket Nos. 137-2 ¶ 54 and 141-1 ¶ 54).

39. After securing a permanent position with the University in 1990, Cotto joined the Union, as it was voluntary to do so at the time. (Docket Nos. 137-2 ¶ 55 and 141-1 ¶ 55).

40. On December 7, 2020, Cotto submitted a letter to UPR and the Union's President demanding an end to dues deductions from his wages and withdrawing from membership in the Union. (Docket Nos. 137-2 ¶ 64 and 141-1 ¶ 64).

41. Union dues continued being deducted from Cotto's wages through his paycheck dated May 28, 2021. (Docket Nos. 137-2 ¶ 65 and 141-1 ¶ 65).

42. UPR deducted, and the Union collected, $10.00 per semi-monthly paycheck in union dues from Cotto's wages. (Docket Nos. 137-2 ¶ 66 and 141-1 ¶ 66).

43. From the time Cotto attempted to cancel union dues deductions on December 7, 2020, until May 28, 2021, UPR deducted $120 from Cotto's wages ($20 per month or $10 semi-monthly) for payments of union dues remitted to the Union. (Docket Nos. 137-2 ¶ 67 and 141-1 ¶ 67).

44. Pérez started her employment with UPR's Rio Piedras Campus on March 20, 2014. (Docket Nos. 137-2 ¶ 68 and 141-1 ¶ 68).

45. Pérez initially held an administrative position at UPR, followed by a position as a maintenance worker. (Docket Nos. 137-2 ¶ 69 and 141-1 ¶ 69).

46. On November 25, 2020, Pérez submitted a letter to the Union demanding an end to dues deductions from her wages and withdrawing from membership in the Union. (Docket Nos. 137-2 ¶ 77 and 141-1 ¶ 77).

47. UPR deducts, and the Union collects, $10.00 per semi-monthly paycheck in union dues from Pérez's wages. (Docket Nos. 137-2 ¶ 78 and 141-1 ¶ 78).

48. From the time Pérez attempted to cancel union dues deductions on November 25, 2020, until the date she resigned from her employment on August 13, 2021, UPR deducted $180 from Pérez's wages ($20 per month or $10 semi-monthly) for payments of union dues remitted to the Union. (Docket Nos. 137-2 ¶ 79 and 141-1 ¶ 79).

49. Pérez has since resigned from her job at the University of Puerto Rico, effective August 13, 2021. (Docket Nos. 137-2 ¶ 80 and 141-1 ¶ 80).

50. Union dues were deducted from Pérez's last paycheck dated August 13, 2021. (Docket Nos. 137-2 ¶ 81 and 141-1 ¶ 81).

51. In a letter dated January 20, 2021 addressed to UPR Cayey's Provost, the Union's Treasurer requested an

end to dues deductions from Ramos's wages. (Docket Nos. 137-2 ¶ 82 and 141-1 ¶ 82).

52. In a letter dated January 20, 2021 addressed to UPR Cayey's Provost, the Union's Treasurer requested an end to dues deductions from Méndez's wages. (Docket Nos. 137-2 ¶ 83 and 141-1 ¶ 83).

53. In a letter dated January 20, 2021 addressed to UPR Cayey's Provost, the Union's Treasurer requested an end to dues deductions from Cotto's wages. (Docket Nos. 137-2 ¶ 84 and 141-1 ¶ 84).

54. In a letter dated February 1, 2021 addressed to Ramos, the Union's President informed him that the Union was dropping him from its membership rolls. (Docket Nos. 137-2 ¶ 85 and 141-1 ¶ 85).

55. In the same February 1, 2021 letter to Ramos, the Union's President conveyed that UPR shall cease dues deductions from his wages and that he will be refunded any dues deducted after January 31, 2021. (Docket Nos. 137-2 ¶ 86 and 141-1 ¶ 86).

56. In a letter dated February 1, 2021 addressed to Méndez, the Union's President informed him that the Union was dropping him from its membership rolls. (Docket Nos. 137-2 ¶ 87 and 141-1 ¶ 87).

57. In the same February 1, 2021 letter to Méndez, the Union's President stated that UPR shall cease dues deductions from his wages and that he will be refunded any dues deducted after January 31, 2021. (Docket Nos. 137-2 ¶ 88 and 141-1 ¶ 88).

58. In a letter dated February 3, 2021 addressed to Cotto, the Union's President informed him that the Union was dropping him from its membership rolls. (Docket Nos. 137-2 ¶ 89 and 141-1 ¶ 89).

59. In the same February 3, 2021 letter to Cotto, the Union's President stated that UPR shall cease dues deductions from his wages and that he will be refunded any dues deducted after January 31, 2021. (Docket Nos. 137-2 ¶ 90 and 141-1 ¶ 90).

60. In a letter dated February 1, 2021 addressed to Pérez, the Union's President informed her that the Union was dropping her from its membership rolls. (Docket Nos. 137-2 ¶ and 141-1 ¶ 91).

61. In the same February 1, 2021 letter to Pérez, the Union's President stated that UPR shall cease dues deductions from her wages and that she would be refunded any dues deducted after January 31, 2021. (Docket Nos. 137-2 ¶ 92 and 141-1 ¶ 92).

62. On November 24, 2020, the Union handed Ramos and Méndez the "Renewal and Admission into Health Insurance of the UPR Workers Union and Payroll Deduction Authorization" to know whether they wanted to be part of the Union, and therefore "a participant of the health insurance plan chosen by the Union, according to the collective bargaining agreement" thereby authorizing the corresponding payroll deductions. (Docket Nos. 137-2 ¶ 94; 141-1 ¶ 94 and 100; and 137-49).

63. On November 19, 2020, the Union handed Pérez the same "Renewal and Admission into Health Insurance of the UPR Workers Union and Payroll Deduction Authorization" form described above. (Docket Nos. 137-2 ¶ 104 and 141-1 ¶ 104).

64. The UPR provides health insurance to all its employees whether they are members of a labor organization or not. This health insurance is known at the UPR as the "Institutional Plan". (Docket No. 141-2 ¶ 7).

65. As part of the CBA, the UPR has agreed to allow the Union to negotiate directly with health insurance companies for the health care insurance that would cover the members of the appropriate unit. These health insurance premiums of the employees are paid in accordance to the provisions of the CBA and the regulations of the UPR. (Docket Nos. 141-2 ¶ 8 and 144-1 ¶ 114).

66. The Union is the only labor organization in the UPR that has this benefit in its CBA. The rest of the

employees must use the Institutional Plan. (Docket Nos. 141-2 ¶ 9 and 144-1 ¶ 115).

67.  In 2011, the UPR decided that any employee of the Institution, whether he/she was a member of the Union, could decide to either use and be part of the Institution Plan or use the health insurance plan negotiated by the Union. Before the new health insurance could come into effect, the employees had to fill out a form choosing the health insurance they wanted. (Docket Nos. 141-2 ¶ 10 and 144-1 ¶ 116).

68.  The Union "has decided that moving forward it will separate to a different bank account all the dues it has received from the UPR regarding plaintiffs from the moment they expressed their desire to quit membership in order to give them back the money. All dues the Union receives from the UPR that are for plaintiffs in the future will be separated and be given back to them. Also the Union sent a communication to the UPR asking them to stop withholding union dues to those employees." (Docket No. 141-2 ¶ 15).

69.  Starting in October 2020, the Union initiated a process through which it required members to give express written consent to the new health plan, to their Union membership, and to the payment of dues. (Docket No. 141-2 ¶ 19).

70.  This process was done though a written form in a document used to identify which employees could access the plan negotiated by the Union and which, if they chose to resign from the Union, would have to go with the Institutional Plan. (Docket No. 141-2 ¶ 22).

71.  Considering the pandemic, the Union decided that even if an employee decided to withdraw their union membership, they would keep the health insurance coverage negotiated by the Union until the UPR transferred them onto the Institutional Plan. (Docket No. 141-2 ¶ 24).

72.   The Union has approximately 1,150 members and of
those 1,110 gave express written consent to be part
of the Union between October 2020 to December 2020.
(Docket No. 141-3 ¶ 9).

73.   Of the remaining employees that did not sign the
above-mentioned form, only 7 expressly requested to
withdraw their membership and stop collecting dues,
and that includes the plaintiffs in this case. The
others that have not signed the form have not
expressed any intention of withdrawing from the
Union even though they were informed that they have
the right to do so. (Docket No. 141-3 ¶ 10).

### IV.   APPLICABLE LAW AND DISCUSSION

Plaintiffs filed their Amended Complaint on December 28,
2020, after the Supreme Court ruled on Janus on June 27, 2018.
They seek that: (1) the provisions in the CBA between the Union
and the UPR regarding dues and membership be declared
unconstitutional and their enforcement be enjoined; and (2)
damages, which include payment of the fees Defendants received
prior to and after the Janus decision. It must be made clear, that
this is not a class action suit, putative class action suit, or
anything analogous to such proceedings. Though Plaintiffs
originally sought class certification, the Court denied their
request. (*See* Docket No. 135). Although Plaintiffs make it clear
they want to treat this case as a class action as a means to bring
about a change in the law, they only represent themselves.

Further, while the record does not reflect Plaintiffs'
signature to ratify their membership or their authorization to

deduct fees from their wages, this is immaterial. It is undisputed
that since becoming UPR employees, all Plaintiffs were bona fide
Union members subject to the terms and conditions of the CBA. To
that extent, Cotto admitted that he voluntarily joined the Union,
Ramos served as a delegate for the Union, and all Plaintiffs
benefitted from Union services, specifically the health insurance
plan negotiated by the Union. That settled, the Court begins its
analysis with a review of the Janus ruling which controls this
case.

A.    Supreme Court's Ruling in Janus

Janus dealt with a non-union member who was subject to "fair
share" automatic wage deductions which were used to fund a union.
Janus, 138 S. Ct. at 2461-62. Overruling Abood v. Detroit Board of
Education, 431 U.S. 209 (1977), the Supreme Court found such
deductions to be unconstitutional. Janus, 138 S. Ct. at 2486.
Specifically, the Court was concerned with the dangers of compelled
speech and "[c]ompelling individuals to mouth support for views
they find objectionable" by forcing them to subsidize that speech
via compulsory union dues. Id. at 2463. The Court therefore,
condemned the practice of automatically deducting agency fees from
non-members who were "not required to consent before the fees are
deducted." Id. at 2460-61. The Court explicitly limited the reach
of Janus by noting "[s]tates can keep their labor-relations systems

Civil No. 20-01232(GMM)
Page -20-

exactly as they are—only they cannot force nonmembers to subsidize public-sector unions." Id. at 2485 n.27.

B.   UPR and Union's CBA

This case stems from the Supreme Court's decision in Janus, in which, as stated, the Court held that the collection of agency shop fees from nonconsenting employees by state or public-sector unions was a violation of the First Amendment. Labor laws in the United States authorize employers and labor organizations to bargain for an "agency shop." See Diamond v. Pa. State Educ. Ass'n, 972 F.3d 262, 265 (3d Cir. 2020). An agency shop arrangement permits a union to exclusively represent an entity's employees on the condition that the union represent all the entity's employees, even those who do not join the union. Id. at 265-66.

Puerto Rico law permits public employees to bargain collectively with the State by designating a labor union to serve as the exclusive representative for employees in their bargaining unit. See P.R. Laws Ann. tit. 3, § 1451 et seq. The Union is a bona fide public sector labor organization within the meaning of Law No. 134 of 1960, 3 P.R. Laws Ann. § 702(a), recognized as the exclusive bargaining representative of the employees of the appropriate unit in the UPR. On December 23, 2014, UPR and the Union, agreed on a CBA governing UPR unit members' terms and conditions of employment. The CBA remains in effect.

C.   <u>Plaintiffs' requests for prospective, injunctive, and declaratory relief against the Union and UPR President are now moot</u>

At the outset, in their Amended Complaint, Plaintiffs seek prospective, injunctive, and declaratory relief. Plaintiffs' injunctive relief claims come before us on an undisputed factual record which reveals that all Plaintiffs are no longer members of the Union, are no longer having fees deducted from their pay, and are no longer at any risk of such fee deductions, since the Supreme Court has struck down this practice on constitutional grounds.

1.   <u>Standing and Mootness Principles</u>

It is well known that standing and mootness create different jurisdictional burdens. Article III gives federal courts jurisdiction over "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. Hence, federal courts can entertain actions only if they present live disputes, ones in which both sides have a personal stake. *See* <u>Summers v. Earth Island Inst.</u>, 555 U.S. 488, 492-93 (2009). At the start of litigation, the burden rests on the plaintiff, "as the party invoking federal jurisdiction," to show it has standing to sue. <u>Spokeo, Inc. v. Robins</u>, --- U.S. ----, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016). To do so, a plaintiff must show injury in fact, causation, and redressability. *See* <u>id.</u> Once the plaintiff shows standing at the outset of a case, he need not keep doing so throughout the lawsuit. Instead, the burden shifts. If the defendant claims that some development has mooted

Civil No. 20-01232(GMM)
Page -22-

the case, it bears "[t]he 'heavy burden of persua[ding]' the court" that there is no longer a live controversy. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189 (2000) (*quoting* United States v. Concentrated Phosphate Exp. Ass'n, 393 U.S. 199, 203 (1968)). In other words, mootness is not just "the doctrine of standing set in a time frame." Id. at 189-90 (*quoting* Arizonans for Official English v. Arizona, 520 U.S. 43, 68 n.22 (1997)).

> a.   Voluntary cessation

"The doctrine of mootness enforces the mandate that an actual controversy must be extant at all stages of the review, not merely at the time the complaint is filed. The burden of establishing mootness rests with the party invoking the doctrine[.]" Am. Civil Liberties Union of Massachusetts v. U.S. Conference of Catholic Bishops, 705 F.3d 44, 52 (1st Cir. 2013) (internal quotations and citations omitted).  Even if moot under this standard, an action is not subject to dismissal where the voluntary cessation exception to the mootness doctrine applies. Id. at 43-44. That exception rests on the principle "that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." Id. at 54 (*quoting* City News & Novelty, Inc. v. City of Waukesha, 531 U.S. 278, 284 n.1 (2001)). "However, even in circumstances where the voluntary cessation exception applies, a case may still be found moot if the defendant meets

'the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" Id. at 55 (*quoting* Friends of the Earth, Inc., 528 U.S. at 190).

While the case law relates mostly to voluntary cessation, these principles apply even when the defendant's cessation is not voluntary. *See* Take Doe v. City of Albuquerque, 667 F.3d 1111 (10th Cir. 2012). Most importantly, the defendant's reason for changing its behavior is often probative as to whether it is likely to change its behavior again. A court will understandably be skeptical of a claim of mootness when a defendant yields in the face of a court order and argues that a case is moot because the injury will not recur yet maintains that its conduct was lawful all along. *See* Knox v. SEIU, Local 1000, 567 U.S. 298, 307 (2012); *see also* 13C Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 3533.5, at 248 (3d ed. 2008). On the other hand, if the defendant ceases because of a new statute or a ruling in a completely different case, its argument for mootness is much stronger. *See*, *e.g.*, Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch, 510 F.3d 253, 260 (3d Cir. 2007); Khodara Envtl., Inc. ex rel. Eagle Envtl., L.P. v. Beckman, 237 F.3d 186, 193 (3d Cir. 2001).

In the wake of Janus*,* numerous courts have been confronted with the precise scenario presented here: A Janus-based lawsuit by

employees who were formerly subjected to compulsory dues
deductions and now seek injunctive relief against officials who
have abandoned this "agency shop" practice following the Supreme
Court's ruling. Almost without exception, on these facts, courts
have concluded that plaintiffs' requests for prospective relief
are now moot given that the cessation of this practice was
compelled by the Supreme Court's decision in Janus. *See e.g.*, Adams
v. Teamsters Loc. Union 429, No. 1:19-CV-336, 2019 WL 8333531 (M.D.
Pa. Dec. 5, 2019), report and recommendation adopted sub nom. Adams
v. Teamsters Union Loc. 429, No. 1:19-CV-336, 2020 WL 1558210 (M.D.
Pa. Mar. 31, 2020), aff'd, No. 20-1824, 2022 WL 186045 (3d Cir.
Jan. 20, 2022); Oliver v. Serv. Employees Int'l Union Local 668,
No. CV 19-891, 415 F.Supp.3d 602, 2019 WL 5964778, at *7 (E.D. Pa.
Nov. 12, 2019); LaSpina v. SEIU Pennsylvania State Council, No. CV
3:18-2018, 2019 WL 4750423, at *9 (M.D. Pa. Sept. 30, 2019); Mayer
v. Wallingford-Swarthmore Sch. Dist., No. CV 18-4146, 405
F.Supp.3d 637, 2019 WL 4674397, at *3 (E.D. Pa. Sept. 24, 2019);
Diamond v. Pennsylvania State Educ. Ass'n, 399 F.Supp.3d 361 (W.D.
Pa. 2019), aff'd, 972 F.3d 262 (3d Cir. 2020) (*citing* Hartnett v.
Pa. State Educ. Ass'n, 390 F.Supp.3d 592 (M.D. Pa. May 17, 2019)
(finding comparable claims for declaratory and injunctive relief
moot post-Janus because the "[p]laintiffs face no realistic
possibility that they will be subject to the unlawful collection
of 'fair share' fees.")); Cook v. Brown, 364 F.Supp.3d 1184, 1189

(D. Or. 2019) aff'd, 845 F. App'x 671 (9th Cir. 2021) (finding a request for injunctive relief post-Janus moot because the union had already stopped collecting fair-share fees and thus there was "no live controversy. . .necessitating injunctive relief."); Lamberty v. Conn. State Police Union, No. 3:15-cv-378, 2018 WL 5115559, at *9 (D. Conn. Oct. 19, 2018) (explaining that Janus mooted a challenge to the constitutionality of agency fees because "there is nothing for [the court] to order [the d]efendants to do now."); Yohn v. Cal. Teachers Ass'n, Case No. SACV 17-202-JLS-DFM, 2018 WL 5264076 (C.D. Cal. Sept. 28, 2018) (granting the union's motion to dismiss on mootness grounds after the union complied with Janus); Danielson v. Inslee, 345 F. Supp. 3d 1336, 1339-40 (W.D. Wash. 2018) (finding that Janus mooted a controversy when the State of Washington stopped collecting agency fees post-Janus); Smith v. Bieker, Case No. 18-cv-05472-VC, 2019 WL 2476679, at *1 (N.D. Cal. June 13, 2019)(finding similar claims moot because the State did not plan to enforce the unconstitutional statute in light of Janus). *See also* Mayer v. Wallingford-Swarthmore Sch. Dist., No. CV 18-4146, 405 F.Supp.3d 637, 2019 WL 4674397, at *3 (E.D. Pa. Sept. 24, 2019); Molina v. Pennsylvania Soc. Serv. Union, 392 F.Supp.3d 469, 471 (M.D. Pa. 2019); Hamidi v. Serv. Employees Int'l Union Local 1000, 386 F.Supp.3d 1289, 1295 (E.D. Cal. 2019); Akers v. Maryland State Educ. Ass'n, 376 F.Supp.3d 563, 572 (D.

Civil No. 20-01232(GMM)
Page -26-

Md. 2019); Lee v. Ohio Educ. Ass'n, 366 F.Supp.3d 980 (N.D. Ohio 2019).

Here, Plaintiffs filed their original complaint. Shortly thereafter they resigned from the Union and ceased to be Union members. Thus, they no longer have a personal stake in receiving a declaration addressing the constitutionality of the Union's actions, particularly those pertaining to CBA Sections 1.D. and 1.E.

In addition, Plaintiffs' request for declaratory relief is overly broad, commenting on the law and CBA generally rather than clarifying Plaintiffs' own rights. Equitable relief may extend benefits to others, if necessary to give Plaintiffs the relief they are entitled. See Easyriders Freedom F.I.G.H.T. v. Hannigan, 92 F.3d 1486, 1501-02 (9th Cir. 1996). But its proper purpose is to give Plaintiffs relief, not to effect a change in the law statewide. As such, Plaintiffs' request that the Court declare the CBA sections unconstitutional under the First and Fourteenth Amendments is inappropriate.

Plaintiffs further attempt to resist and ignore the rising tide of case law involving similar claims by invoking the voluntary cessation doctrine. The difficulty with their assertion in the instant case is that: (1) virtually every court which has considered this argument following the Supreme Court's decision in Janus has rejected it; and (2) the argument fails to consider the

undisputed facts of this case. We are not before a situation in which the voluntary cessation doctrine applies because a litigant has made a brief and temporary tactical legal retreat due to an uncertain legal landscape. Quite the contrary, the United States Supreme Court has clearly and definitively set a legal standard and the actions of the Defendants reflect compliance with the Court's unmistakable mandate.

Therefore, the facts present a strong case of mootness by voluntary cessation. Until _Janus_, the Union had every reason to believe, under _Abood_, that they could collect agency fees from non-members.  Once the Supreme Court changed course in _Janus_, the Union conceded that Puerto Rico law and the CBA's agency-fee arrangement was no longer lawful. They have since ceased collecting fees from non-members. So, we see no reasonable likelihood that the Union will try to collect agency fees from the Plaintiffs in the future. Cf. _Knox_, 567 U.S. at 307-08 (finding a similar challenge not moot because the defendant union insisted that agency fees were constitutional).

Considering _Janus_ and the presented facts, Plaintiffs —who have withdrawn from the Union and are thus admittedly no longer subject to dues deductions— do not face the threat of future dues deductions since the Supreme Court struck down such "agency shop" arrangement that previously compelled dissenting employees to pay union dues. Given that this practice is no longer in effect and

cannot be constitutionally reinstituted pursuant to the Court's decision in Janus, we agree with the decisions of our sister courts who have found prospective, injunctive, and declaratory relief requests like those made here to be moot.

D.   Plaintiffs' Post-Janus Claims for Damages

Plaintiffs also seek a refund of membership dues erroneously deducted from their paychecks following their resignation from the Union, as well as damages for the alleged constitutional violations related to such deductions. They argue that the Union's failure to promptly honor their resignation and cease deducting union dues from their salaries violated the First and Fourteenth Amendments and Janus. The Court finds that the deduction of membership dues without authorization in this context may be an injury. But, it is not a constitutional one. Certainly, Janus compels no such result.

In Janus, the Supreme Court concluded that public-sector unions cannot collect "an agency fee [ ]or any other payment. . .from a nonmember's wages" unless the employee "clearly and affirmatively consent[s] before any money is taken." Janus, 138 S. Ct. at 2486 (emphasis added). Here, Plaintiffs presumptively became "non-members" of the Union when they sent their resignation letters to the Union (Ramos and Méndez on July 3, 2018; Cotto on December 7, 2020; and Pérez on November 25, 2020). In those letters, Plaintiffs gave clear and affirmative dissents. ("I am writing to re-affirm my July 3, 2018 resignation from membership

in [the Union], and revocation of any dues deduction authorization
I might have signed" and "Under *Janus v. AFSCME*, I insist that you
immediately cease deducting any and all union dues from my
paychecks."). Despite those asseverations, it was not until
February 1, 2021 that the Union's President notified all four
Plaintiffs that they were no longer considered members of the
Union. Also, the Union continued to deduct union dues from
Plaintiffs, for over two years and ten months after their
resignations, when, in a strict sense, they were non-members.

Nonetheless, Janus's allusion to "any other payment. . .from
a nonmember[ ]" must be read in context. The Supreme Court made
clear with its statement that it was primarily demarcating the
constitutional rights of non-members currently or previously
employed in agency shop arrangements. *See* Janus, 138 S. Ct. at
2486 (holding that "[t]his procedure," that is, the procedure by
which "[s]tates and public-sector unions. . .extract agency fees
from nonconsenting employees," "violates the First Amendment.")
Until Janus gave Plaintiffs a reason to resign from the Union,
they were bona fide dues-paying members. Furthermore, "Janus does
not condone punishing unions for their attempt to implement a new
constitutional regime after the old one had been in place for over
forty years. That old regime supported the statutory schemes of
nearly half the states [—and territories—] underpinning thousands
of collective bargaining agreements involving millions of

employees." <u>LaSpina v. SEIU Pennsylvania State Council</u>, 985 F.3d 278, 288 (3d Cir. 2021). Moreover, the <u>Janus</u> Court even recognized that its ruling would impose "unpleasant transition costs" on the unions that had come to rely on the previous regime and had built statutory schemes around it. *See* <u>Janus</u>, 138 S. Ct. at 2485.

Thus, like other courts' determinations in similar cases we find that "[g]iven the enormity of the task faced by public-sector unions in the wake of Janus, and the lack of any direction from the Supreme Court that the period in which union members transitioned to nonmembers could give rise to new constitutional violations, we decline to find any First Amendment violation under Janus for an employer's or union's failure to promptly process a member's resignation notice and terminate the associated dues deductions." <u>LaSpina v. SEIU Pennsylvania State Council</u>, 985 F.3d at 288.

Nonetheless, it is undisputed that the Union continued to deduct fees from Plaintiffs' wages even after they gave notice of the resignation from membership and that the Union unequivocally asserted before this Court that it will "separate to a different bank account all the dues it has received from the UPR regarding plaintiffs from the moment they expressed their desire to quit membership in order to give them back the money" and that "[a]ll dues the Union receives from the UPR that are for plaintiffs in the future will be separated and be given back to them." For those

Civil No. 20-01232(GMM)
Page -31-

reasons, the Court grants in part Plaintiffs' Motion for Summary Judgment, ordering Defendants to pay Plaintiffs the stipulated amount of dues that were deducted from their wages since their dates of resignation (July 3, 2018 for Ramos and Méndez; December 7, 2020 for Cotto; and November 25, 2020 for Pérez) until their last deductions in paychecks dated May 28, 2021 and August 13, 2021, respectively. *See* Findings of Fact Nos. 30, 37, 43 and 48.

E.  Plaintiffs' Pre-Janus Claims for Damages

Plaintiffs also seek damages from the Defendants for alleged constitutional infractions resulting from dues deductions made prior to their resignation from the Union.

1.  First Amendment Claim

Plaintiffs move for summary judgment on their First Amendment claims, arguing that the UPR and the Union withdrew wages from their paychecks without their affirmative consent or waiver. They argue that under Janus, all union dues deductions must be made with clear and compelling evidence of the employee's knowing, voluntary, and intelligent waiver. Plaintiffs contend that such consent did not occur in their case. Yet, Janus does not support such a request for back dues. Based on the unique facts of this case, Plaintiffs' claims for retroactive damages fail on various grounds.

First, as every Court confronted with the same arguments that Plaintiffs present here has concluded, their claims fail because

they unequivocally opted to become Union members and to pay membership dues. <u>Janus</u> spoke only to state compelled dues deductions from non-union members, not union members like Plaintiffs. In contrast to the plaintiff in <u>Janus</u>, Plaintiffs here agreed to become Union members, pay Union dues, and receive the associated benefits under then valid law and the existing CBA. Additionally, the Supreme Court's decision in <u>Janus</u> did not alter Plaintiffs' contractual commitments to become Union members and pay the associated dues because "the First Amendment does not confer ... a constitutional right to disregard promises that would otherwise be enforced under state law." <u>Cohen v. Cowles Media Co.</u>, 501 U.S. 663, 672 (1991). A change in law that alters the original considerations for entering an agreement does not allow retroactive invalidation of an agreement. *See* <u>Town of Koshkonong v. Burton</u>, 104 U.S. 668, 679.

Second, Plaintiffs' claims fail because they ignore the legal and factual backdrop of this case. Prior to June of 2018, the practice engaged in by the UPR and the Union of seeking dues deductions from these employees was commonplace, expressly authorized by statute, and constitutionally endorsed by the United States Supreme Court in <u>Abood</u>. Thus, prior to the fundamental change in the law through the ruling in <u>Janus</u>, Defendants had no reason to question the lawfulness of their conduct.

Civil No. 20-01232(GMM)
Page -33-

Moreover, once the legal paradigm changed, they accepted the Plaintiffs' resignations from the Union, halted their dues deductions, and created a bank account with the dues that had been deducted, with the promise of returning Plaintiffs' money. Plaintiffs undoubtedly have not paid union dues, since this litigation was pending.

2.   Due Process Claim

Plaintiffs also move for summary judgment on their Due Process claims under the Fourteenth Amendment arguing that the statute authorizing dues deductions in conjunction with the Union's CBA, establishes a system that allows for the withdrawal of wages without sufficient procedural safeguards.

To state a claim under Section 1983 for a violation of procedural due process, a plaintiff must: (1) identify a liberty or property interest; (2) show that the state has deprived the plaintiff of that interest; and (3) show that the deprivation was affected without due process of law. *See* Khelfaoui v. Lowell Sch. Comm., 496 F.Supp.3d 683, 691 (D. Mass. 2020) (*citing* Perez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 30 (1st Cir. 2008); Harron v. Town of Franklin, 660 F.3d 531, 537 (1st Cir. 2011)). "Even if there is state action, the ultimate inquiry in a Fourteenth Amendment case is, of course, whether that action constitutes a denial or deprivation by the State of rights that the Amendment protects." Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 155 n.4 (1978).

Plaintiffs' Fourteenth Amendment claim that the deduction of union dues from their paychecks violated procedural due process fails. Here, the question is not whether Plaintiffs possessed a liberty or property interest in their wages, but whether they suffered a deprivation of a constitutionally protected interest when the UPR and the Union deducted membership dues according to existing CBA membership agreements. The answer, as every identified Court which examined this issue concluded, is that they did not. Rather, they assented to Union membership and deduction of Union dues. Although Plaintiffs wish to allege that they were coerced into their contractual relationship with the Union, insisting they were forced to pay dues, the undisputed fact is that they chose to join the Union and to authorize Defendants to deduct dues from their paychecks since beginning of their employment with UPR as per the existing CBA. They did so in exchange for the benefits of union membership, and they "assumed the risk that subsequent changes in the law could alter the cost-benefit balance of their bargain." Fischer v. Governor of N.J., 842 F. App'x 741, 753 (3d Cir. 2021).

   3.   Applicability of the Good Faith Defense

Plaintiffs' damages claims also fail to acknowledge another undisputable legal fact: the existence of a good faith defense when parties act in reliance upon what was then-existing law. A private entity may avail itself of a good faith defense in

litigation brought pursuant to Section 1983. The Supreme Court has held that private parties sued under Section 1983 cannot claim qualified immunity, but it has suggested in dicta that such parties might be able to assert a good faith defense to liability instead. Wyatt v. Cole, 504 U.S. 158, 168-69 (1992); Lugar v. Edmondson Oil Co., 457 U.S. 922, 942 n.23 (1982).

In this regard, we note that: "every federal appellate court to have decided the question has held that, while a private party acting under color of state law does not enjoy qualified immunity from suit, it is entitled to raise a good-faith defense to liability under section 1983." Janus v. Am. Fed'n of State, Cty. & Mun. Employees, Council 31; AFL-CIO, 942 F.3d 352, 362 (7th Cir. 2019); see also Doughty v. State Employees' Ass'n of New Hampshire, SEIU Loc. 1984, CTW, CLC, 981 F.3d 128 (1st Cir. 2020).

Here, the dues deductions that were undertaken by Defendants were plainly done in good faith, in reliance on a state statute and a valid CBA which expressly authorized this practice, and in accordance with then existing Supreme Court precedent which constitutionally endorsed such union dues deductions. Furthermore, when the Supreme Court's Janus decision fundamentally altered this legal landscape, the Defendants halted the dues deductions for those employees who chose to withdraw from the Union and placed dues deducted after their resignation in a separate bank account with the intention of repayment. On these facts, we conclude that

it is evident that a defense of good faith reliance upon then existing law applies here, and bars Plaintiffs' Section 1983 damages claims. We are not alone in reaching this conclusion.[2]

Upon the uncontested evidence establishing that Defendants took these dues deductions in accordance with then-existing law, and then conformed their conduct to the change in the law following the Supreme Court's decision in Janus, it is unquestionable that this Court should follow the growing legal consensus finding that the good faith defense applies here. Accordingly, these damages claims should also be dismissed.

---

[2] *See* Hamidi v. Serv. Emps. Int'l Union Loc. 1000, No. 214CV00319WBSKJN, 2019 WL 5536324 (E.D. Cal. Oct. 25, 2019), aff'd, No. 19-17442, 2021 WL 4958855 (9th Cir. Oct. 26, 2021); Allen v. Santa Clara Cnty. Corr. Peace Officers Ass'n, 400 F. Supp. 3d 998 (E.D. Cal. 2019), aff'd, 38 F.4th 68 (9th Cir. 2022); Ogle v. Ohio Civ. Serv. Emps. Ass'n, AFSCME, Loc. 11, 397 F. Supp. 3d 1076 (S.D. Ohio 2019), aff'd sub nom. Ogle v. Ohio Civ. Serv. Emps. Ass'n, AFSCME Loc. 11, AFL-CIO, 951 F.3d 794 (6th Cir. 2020); Diamond v. Pennsylvania State Educ. Ass'n, 399 F. Supp. 3d 361 (W.D. Pa. 2019), aff'd, 972 F.3d 262 (3d Cir. 2020); Hernandez v. AFSCME California, 386 F. Supp. 3d 1300 (E.D. Cal. 2019); Doughty v. State Employee's Ass'n, No. 1:19-cv-00053-PB (D.N.H. May 30, 2019), aff'd Doughty v. State Employees' Ass'n of New Hampshire, SEIU Loc. 1984, 981 F.3d 128 (1st Cir. 2020); Babb v. California Tchrs. Ass'n, 378 F. Supp. 3d 857 (C.D. Cal. 2019), aff'd sub nom. Martin v. California Tchrs. Ass'n, No. 19-55761, 2022 WL 256360 (9th Cir. Jan. 26, 2022), and aff'd, No. 19-55692, 2022 WL 262144 (9th Cir. Jan. 26, 2022), and aff'd sub nom. Wilford v. Natl Educ. Ass'n of United States, No. 19-55712, 2022 WL 256724 (9th Cir. Jan. 26, 2022); Wholean v. CSEA SEIU Loc. 2001, No. 3:18-CV-1008 (WWE), 2019 WL 1873021 (D. Conn. Apr. 26, 2019), aff'd, 955 F.3d 332 (2d Cir. 2020); Akers v. Maryland State Educ. Ass'n, 376 F. Supp. 3d 563 (D. Md. 2019), aff'd, 990 F.3d 375 (4th Cir. 2021); Bermudez v. SEIU Local 521, 2019 WL 1615414 (N.D. Cal. Apr. 16, 2019); Lee v. Ohio Educ. Ass'n, 366 F. Supp. 3d 980 (N.D. Ohio 2019), aff'd, 951 F.3d 386 (6th Cir. 2020); Crockett v. NEA-Alaska, 367 F. Supp. 3d 996 (D. Alaska 2019), aff'd, 854 F. App'x 785 (9th Cir. 2021); Carey v. Inslee, 364 F. Supp. 3d 1220 (W.D. Wash. 2019), aff'd sub nom. Carey v. Washington Educ. Ass'n, 845 F. App'x 675 (9th Cir. 2021); Cook v. Brown, 364 F. Supp. 3d 1184 (D. Or. 2019), aff'd, 845 F. App'x 671 (9th Cir. 2021); Danielson v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 28, AFL-CIO, 340 F. Supp. 3d 1083 (W.D. Wash. 2018), aff'd sub nom. Danielson v. Inslee, 945 F.3d 1096 (9th Cir. 2019); *see also* Mooney v. Illinois Educ. Ass'n, 942 F.3d 368, 369 (7th Cir. 2019).

Civil No. 20-01232(GMM)
Page -37-

F.    State Law Claims

      1. Supplemental Jurisdiction

      Plaintiffs also originally sought damages upon supplemental jurisdiction pursuant to 28 U.S.C. § 1367 on state breach of contract claims. Yet, in their *Memorandum in Support for Summary Judgment* they stated that "[h]aving evaluated the written discovery materials, Plaintiffs are not seeking summary judgment as to the Verified Amended Complaint's Fourth Count of breach of contract and are withdrawing the same." (Docket No. 137-1 at 2 n.2). Consequently, and since the Court has dismissed the federal law claims, these claims shall also be dismissed.

**V.    CONCLUSION**

      For the reasons stated above, Plaintiffs' *Motion for Summary Judgment* is **DENIED**. Defendants are to pay Plaintiffs the stipulated amount of union dues that were deducted since their date of resignation as set forth in this Opinion. All remaining claims from Plaintiffs' Amended Complaint are **DISMISSED WITH PREJUDICE**. Judgment will be entered accordingly.

      IT IS SO ORDERED.

      In San Juan, Puerto Rico, this September 27, 2023.


                              s/Gina R. Méndez-Miró
                              GINA R. MÉNDEZ-MIRÓ
                              UNITED STATES DISTRICT JUDGE